**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| JUSTIN A. WHITE, ] | |
| ] | |
|     **Plaintiff,** ] | |
| ] | |
| v. ] | |
| ] | **Case No.: 2:13-cv-00099-KOB** |
| CITY OF BIRMINGHAM, ] | **(LEAD CASE)** |
| ALABAMA, *et al.*, ] | |
| ] | |
|     **Defendants.** ] | |

| | |
|---|---|
| LATISHA WILLIAMS, ] | |
| ] | |
|     **Plaintiff,** ] | |
| ] | |
| v. ] | |
| ] | **Case No.: 2:13-cv-01006-KOB** |
| CITY OF BIRMINGHAM, ] | |
| ALABAMA, *et al.*, ] | |
| ] | |
|     **Defendants.** ] | |

**MEMORANDUM OPINION**

This § 1983 case comes before the court, in Plaintiffs Justin White and Latisha Williams' consolidated cases, on Defendants City of Birmingham, Alabama, Mayor William A. Bell, Officer Herman Harris, Jr., and Officer Eric Smith's "Motion for Summary Judgment and Supporting Evidence," (Doc. 34); White and Williams' "Motion to Strike Defendants' Exhibits Five (5) & Six (6)," (Doc. 43); White and Williams' "Motion for Judicial Notice," (Doc. 44); and the Defendants' "Motion to Strike," (Doc. 54).[1]

_____

[1]The records in both cases are essentially identical and the parties' briefings on all motions address both plaintiffs' claims collectively. Thus, because White's case, 2:13-cv-00099-

1

For the reasons discussed below, the court **GRANTS** the Defendants' motion for summary judgment, (Doc. 34); **GRANTS** in part and **DENIES** in part White and Williams' motion for judicial notice, (Doc. 44); **DENIES** White and Williams' motion to strike, (Doc. 43); and **DENIES** the Defendants' motion to strike, (Doc. 54).

In general, the undisputed facts show that on November 30, 2012, plaintiff Williams and Deandre Major were passengers in a vehicle driven by plaintiff White. An occupant of White's vehicle fired a weapon at an unmarked Birmingham Police Department vehicle driven by defendant BPD Officer Harris with defendant BPD Officer Smith and defendant Birmingham Mayor Bell as passengers. Officer Harris followed White's vehicle onto Interstate 59 while Officer Smith radioed for backup. As White raced down Interstate 59, his steering wheel locked up and he crashed. Officers Harris and Smith stopped near White's vehicle and attempted to apprehend the occupants of White's vehicle, who Officers Harris and Smith thought to be armed and willing to shoot. Officers Harris and Smith fired their weapons a total of eleven times at the vehicle hitting White twice and Williams once.

Once Officers Harris and Smith regained control of the situation and backup arrived, ambulances transported White and Williams to the University of Alabama Birmingham medical center. White received treatment at UAB and remained at UAB for two weeks and a few days. Williams received treatment at UAB and UAB released her after two days. During part of their stays at UAB, BPD restrained White and Williams with handcuffs and posted BPD officers near their rooms.

---

KOB, is designated as the lead case, all references to the record are to White's case unless otherwise noted.

2

White and Williams have now sued pursuant to 42 U.S.C. § 1983 and Alabama state law, arguing that the City, Mayor Bell and Officers Harris and Smith violated their constitutional rights by using excessive force, and violated their rights under state law by assaulting, battering, and falsely imprisoning them. The Defendants argue that they are entitled to summary judgment on all of White and Williams' claims. The court agrees with the Defendants because the Defendants are immune from suit on all of White and Williams' claims.

Before addressing the Defendants' summary judgment motion, however, the court must rule on several motions to determine the record before it for summary judgment purposes.

**I.      Motion for Judicial Notice**

White and Williams request that the court take judicial notice of the following facts pursuant to Federal Rule of Evidence 201:

1.    A Consent Decree filed in *McGill v. City of Birmingham*, 74-G-0692, on June 29, 1984, (Doc. 44-1);
2.    A 2013 Motion filed by the City of Birmingham seeking relief from the requirements imposed by the Consent Decree in *McGill*, (Doc. 44-2);
3.    An Order modifying in part the Consent Decree in *McGill*, (not attached);
4.    That the calendar date of March 14, 2014 occurred after the date of November 20, 2012;
5.    That the calendar date of December 1, 2012 occurred before the calendar date of March 14, 2014;
6.    That the calendar date of December 2, 2012 occurred prior to the calendar date of March 14, 2014;
7.    That the calendar date of December 30, 2012 occurred before the calendar date of March 14, 2014;
8.    That a living person born on March 8, 1994 was eighteen years of age on November 30, 2012;
9.    That the article *Birmingham Mayor William Bell Said He Was Not The Target Of A Wild Interstate Shooting Friday Night*, written by Carol Robinson, **was posted** to the website of Alabama Media Group on December 3, 2012, (Doc. 44-3);
10.   That the Birmingham News article, *Video Of Police Beating Prompts Birmingham Mayor Bell To Calls For More Training*, written by Carol

3

Robinson, Joseph D. Bryant, and Jeremy Grey **was published** on March 31, 2011, at 10:55 p.m. and updated on April 1, 2011, at 6:45 a.m., (Doc. 44-4);

11.     That the Birmingham News article, *Birmingham City Council Summons Police Chief A.C. Roper For Hearing On Allegations About Department's Use Of Force*, written by Joseph D. Bryant, **was published** on April 20, 2011, at 7:30 a.m., (Doc. 44-5);

12.     That the Birmingham News article, *Birmingham Council President Wants Police Chief To Report On Excessive-Force Complaints Against Department*, written by Joseph D. Bryant, **was published** on April 19, 2011, at 11:45 a.m. and updated on April 19, 2011, at 6:37 p.m., (Doc. 44-6); and

13.     Any case filed in the United States District Court For The Northern District of Alabama, Southern Division.

(Doc. 44) (emphasis added). Generally, these items can be grouped into court documents (items 1, 2, 3, and 13), logical facts (items 4, 5, 6, 7, and 8), and news articles (items 9, 10, 11, and 12).

The court may take judicial notice when an adjudicative fact "is not subject to reasonable dispute" because the fact is either (1) "generally known within the trial court's jurisdiction;" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (finding only indisputable facts may be judicially noticed).

### A.     Court Documents

White and Williams request the court take judicial notice of certain court documents in items 1, 2, 3, and 13. The Defendants do not object. While the court "may not infer the truth of all the facts in the documents contained in [its own] records, the Court may take judicial notice of those records." *In re Steeley*, 243 B.R. 421, 427 (Bankr. N.D. Ala. 1999); *see Ackermann v. United States*, 178 F.2d 983, 985 (5th Cir. 1949).[2] Therefore, the court **GRANTS** the motion as

---

[2]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed

to the fact that the court documents *exist* and **DENIES** the motion as to the *factual accuracy* of the content of court documents.

B.     **Logical Facts**

White and Williams request the court take judicial notice of certain logical facts concerning dates and ages in items 4, 5, 6, 7, and 8. The Defendants do not object. Therefore, the court **GRANTS** the motion as to these logical facts.

C.     **News Articles**

White and Williams request the court take judicial notice that the news articles in items 9, 10, 11, and 12 were published. The Defendants argue that these items do not meet the requirements for judicial notice in the Federal Rules of Evidence.

The court **GRANTS** the motion as to the fact that the news articles were *published*. However, the court **DENIES** the motion as to the *factual accuracy* of the news articles because the "facts" printed in the news articles are still subject to reasonable dispute. *See Shahar v. Bowers*, 120 F.3d 211, 214, nt. 5 (11th Cir. 1997) ("[Movant] has shown us no case – and we have found none – where a federal court of appeals took judicial notice of the unofficial conduct of one person based upon newspaper accounts . . . about that conduct."). Additionally, the court **DENIES** the motion as to White and Williams' *characterization* of the news articles. *See In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1318 (N.D. Ga. 2001) (finding court may not take judicial notice of "conclusory characterizations of such statements in the plaintiffs' complaint").

---

down prior to October 1, 1981.

### D.      Summary

In summary, the court **GRANTS** in part and **DENIES** in part White and Williams'

motion for judicial notice.

### II.      White and Williams' Motion to Strike

White and Williams ask the court to strike exhibits five and six to the Defendants' motion

for summary judgment. Exhibit five is Williams' statement to BPD Investigator Jeff Steele on

December 1, 2012 at 10:31 a.m. at UAB describing the events of November 30, 2012 leading up

to and after White and Williams' encounter with BPD. (Doc. 36-5). Exhibit six is a declaration

by Investigator Steele describing the procedures he took during and after his interview with

Williams. (Doc. 36-6).

Whether to grant a motion to strike is an evidentiary ruling within the court's discretion.

*See United States v. Stout*, 667 F.2d 1347, 1353 (11th Cir. 1982) ("A trial court's ruling as to the

materiality, relevancy or competency of testimony or exhibits will ordinarily not warrant reversal

unless constituting an abuse of discretion." (internal citations omitted)). For the reasons

discussed below, the court **DENIES** White and Williams' motion to strike.

### A.      Competency

White and Williams first argue that Williams' statement should be excluded because she

was a minor under the influence of medication when she gave the statement to Investigator

Steele. First, whether Williams was a minor when she made her statement is irrelevant. "Every

person is competent to be a witness unless [the Federal Rules of Evidence] provide otherwise."

Fed. R. Evid. 601; *see United States v. Perez*, 526 F.2d 859, 865 (5th Cir. 1976) ("The ultimate

test of competence of a young child is whether [she] has the requisite intelligence and mental

6

capacity to understand, recall and narrate [her] impressions of an occurrence.").

Second, whether Williams was medicated does not render her incompetent. Williams argues she was under the influence of pain medication when Investigator Steele interviewed her on December 1, 2012 at 10:31 a.m. and some medical records indicate that UAB prescribed her medication as early as November 30, 2012. (Doc. 36-7, 53). Rather than exclusion, however, the court finds that Williams' statement is better addressed by taking every reasonable inference from her statement in White and Williams' favor for purposes of summary judgment. *See McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1240 (11th Cir. 2003) (using most favorable testimony of plaintiff on summary judgment when plaintiff was medicated when providing some parts of testimony).

### B.    Failure to Follow Regulations

White and Williams next argue that Williams' statement should be excluded because BPD did not follow its internal procedures when interviewing her. BPD regulations concerning "Arrests-Juveniles" require "[a]ll officers taking a *juvenile* into custody" to "notify the *juvenile's* parents or legal guardian." (Doc. 43-8, 3 (emphasis added)). Further, "[t]he officer advising a *juvenile* of 'Constitutional Rights' (Miranda Warning) shall have the *juvenile* . . . sign the Rights Waiver Form." (Doc. 43-8, 10-11 (emphasis added)). "*Juvenile* means "a child *under* the age of 18 . . . .'" (Doc. 43-8, 1 (emphasis added)). Williams was a minor when Investigator Steele interviewed her because she was only 18. However, the explicit words of the regulations state that the regulations only apply to persons *under* 18. Thus, Investigator Steele did not violate the regulations.

Further, even if BPD regulations applied, mere violation of the regulations provides no

basis to strike Williams' statement absent an independent constitutional violation. *See United States v. Caceres*, 440 U.S. 741, 754–55 (1979); *see United States v. Teers*, --- Fed. App'x ---, No. 13-15677, 2014 WL 6764272, at *11 (11th Cir. Dec. 2, 2014) (finding that even if a government agent violated IRS regulations, the *violation of the IRS regulation* was not a ground to suppress a plaintiff's statement to agent). In *Teers*, the Eleventh Circuit explained:

> [A] rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures. [I]t is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.

2014 WL 6764272, at *13 (internal citations omitted). Therefore, failure to follow BPD regulations is no basis to strike Williams' statement.

### C.    Exclusionary Rule

White and Williams next contend that Williams' statement should be excluded under a civil application of the exclusionary rule because Investigator Steele did not read Williams her *Miranda* rights prior to beginning a custodial interrogation.

The Supreme Court has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials." *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (inapplicable to parole hearing); *see United States v. Calandra,* 414 U.S. 338, 354 (1974) (inapplicable to grand jury proceedings); *see United States v. Janis*, 428 U.S. 433, 459-60 (1976) (inapplicable to civil claim for tax refund); *see I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1034 (1984) (inapplicable to deportation hearing).

Other courts have found the exclusionary rule inapplicable in § 1983 claims. *See Townes*

*v. City of New York,* 176 F.3d 138, 149 (2d Cir. 1999); *see Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997); *see Thompson v. Carthage Sch. Dist.*, 87 F.3d 979, 981 (8th Cir. 1996); *see Medlock v. Trustees of Indiana Univ.*, 738 F.3d 867, 872 (7th Cir. 2013); *see Chatman v. Slagle*, 107 F.3d 380, 382 (6th Cir. 1997); *accord Shorter v. Dollar*, No. 3:11CV531-WHA, 2011 WL 5358652, at *10 (M.D. Ala. Nov. 7, 2011).

To determine whether to apply the judge-made exclusionary rule, the court must "weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs." *Lopez-Mendoza*, 468 U.S. at 1041. Benefits include deterring unlawful police conduct. Costs include the loss of probative evidence and more expensive adjudications. *Id.* Here, exclusion of Williams' statement may have some deterrent effect on BPD's procedures because BPD both collected the statement from Williams and is sued by Williams. *See Janis*, 428 U.S. at 458 (finding deterrent effect more "highly attenuated" when exclusionary rule removes evidence in civil case against a different sovereign than collected the evidence). However, Williams' statement is of immense probative value to the court's analysis of the summary judgment motion.

On balance, given the overwhelming case law against extending the exclusionary rule to civil cases, the court will not strike Williams' statement as the fruit of an alleged constitutional violation.

### D.     Hearsay

White and Williams further argue that Williams' statement should be excluded because it is hearsay that does not fall within any hearsay exception. However, "[t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). "Of course, statements made out of court by a

party-opponent are universally deemed admissible when offered against him." *U. S. for Use & Benefit of Carter Equip. Co. v. H. R. Morgan, Inc.*, 544 F.2d 1271, 1273 (5th Cir. 1977). Thus, the hearsay ground fails to hold water.

### E.      Summary

White and Williams have offered no legitimate basis for excluding Investigator Steele's declaration describing the procedures he took during and after Williams' interview. Thus, Investigator Steele's declaration should not be excluded.

In summary, the court **DENIES** White and Williams' motion to strike exhibits 5 and 6 to the Defendants' motion for summary judgment. However, the court will read Williams' statement in the light most favorable to White and Williams and will draw every reasonable inference in their favor.

### III.      The Defendants' Motion to Strike

The Defendants ask the court to strike exhibits L, L1, L2, L3, L4, L5; portions of exhibit M; and exhibits R, S, and U to White and Williams' response to the Defendants' motion for summary judgment. Exhibits L and L1 are BPD incident/occurrence reports ("IO reports") related to the drive-by shooting of Alfred Murphy on November 30, 2012. Exhibits L2, L3, L4, and L5 are IO reports related to White and Williams' November 30, 2012 encounter with BPD. Exhibit M is Deandre Major's declaration. Exhibits R, S, and U are news reports.

Whether to grant a motion to strike, an evidentiary ruling, falls within the discretion of the district court. *See Stout*, 667 F.2d at 1353. For the reasons discussed below, the court **DENIES** the Defendants' motion to strike.

### A.      Incident/Offense Reports

The Defendants argue that the IO reports are inadmissible because the reports themselves are hearsay and because the IO reports contain hearsay within hearsay. L and L1 contain the time of the Murphy shooting that Murphy communicated to BPD Officer Penn who subsequently recorded the time in two IO reports.[3] L2, L3, L4, and L5 contain the fact that BPD detained White and Williams as suspects on November 30, 2012, which was communicated to various BPD officers who then recorded the fact in various IO reports.

Generally, inadmissible hearsay cannot be considered on a motion for summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). However, a court may consider a hearsay statement "if the statement *could* be reduced to admissible evidence at trial" because, for example, the statement falls within a hearsay exception or is not offered for the truth of the matter asserted. *Id.* at 1323-24 (internal quotations omitted and emphasis added); s*ee Gamble v. PinnOak Res., LLC*, 511 F. Supp. 2d 1111, 1123, nt. 5 (N.D. Ala. 2007) (finding court may consider hearsay statement for purposes of summary judgment if the plaintiffs "could feasibly authenticate most of the exhibits and overcome hearsay objections at trial" even if the statement is hearsay at the summary judgment stage). "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

First, the IO reports themselves are hearsay but are admissible under the public records exception to the hearsay rule because they are the official reporting document for BPD for the

---

[3]The Defendants' contention, regarding exhibits L and L1, that Murphy told his mother the time of the shooting and that his mother subsequently spoke to Officer Penn is not supported by the evidence.

November 30, 2012 investigation. *See* Fed. R. Evid. 803(8)(A)(iii); *see Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (finding statements of opinion in police reports admissible if based on a factual investigation and otherwise trustworthy). Also, the IO reports are hearsay but are excluded from the hearsay rule as statements by the agent of a party opponent because the IO reports are used by White and Williams against the Defendants and were made by BPD officers performing official police tasks within the scope of their employment as agents of the City. *See* Fed. R. Evid. 801(d)(2)(D).

Second, the statements to BPD officers in L and L1 are hearsay but could be reduced to admissible form at trial. The only hearsay within hearsay in L and L1 is Murphy's statement to Officer Penn that "on the listed date and time [November 30, 2012 *at 9:20 p.m.*] he was driving the listed vehicle . . . ." (Doc. 42-19). This statement could be reduced to admissible form at trial because Murphy could be compelled to testify at trial about his statement. Alternatively, this statement could be viewed as an excited utterance if the proper foundation were laid at trial because Officer Penn recorded the statement soon after Murphy was involved in a drive by shooting. *See* Fed. R. Evid. 803(2).

Third, the statements to BPD officers in L2, L3, L4, and L5 are hearsay but could be reduced to admissible form at trial. The only hearsay within hearsay in exhibits L2, L3, L4, and L5 are the following statements recorded by Officer Lewis in L3: (1) "I was informed by officer Harris that the mayor was in the vehicle and he was safe"; and (2) "When it was announced that all three suspects were in custody and everything was 10-24 (ok), I observed Lt. Irwin and Sgt. Ward of North Precinct and they appeared to have everything under control." (Doc. 42-22). The remainder of L3 and all of L2, L4, and L5 do not contain any other hearsay within hearsay. (Doc.

12

42-21; Doc. 42-22; Doc. 42-23; Doc. 42-24).

The first statement by Officer Harris to Officer Lewis is hearsay but is excluded from the hearsay rule as a statement by Officer Harris, a party opponent. *See* Fed. R. Evid. 801(d)(2)(D). The second statement by an unnamed speaker to Officer Lewis is hearsay but could be reduced to admissible form at trial because White and Williams could presumably call Officer Lewis at trial to determine who made the statement that "all three suspects were in custody" and could then subsequently elicit the statement from the speaker.

Finally, to the extent the Defendants argue that exhibits L, L1, L2, L3, L4, and L5 do not reflect the information that White and Williams' ascribes to them, those arguments go to the weight of the evidence and is not a basis to strike the exhibits.

### B.     Declaration by Deandre Major

The Defendants argue that paragraph nine of exhibit M should be stricken because the statement is opinion testimony that is not based on scientific, technical, or other specialized knowledge. *See* Fed. R. Evid. 701. Paragraph nine is Deandre Major's declaration that "[w]hen the car crashed, I was knocked out from the crash." (Doc. 42-25, 3). The Defendants' argument is silly. Major is not offering a medical opinion about whether he became unconscious; he is stating a fact he knows–that the crash knocked him out.

### C.     News Articles

The Defendants argue that exhibits R, S, and U should be stricken because the news articles are hearsay offered by White and Williams to prove the truth of the matter asserted in the news articles, that BPD had a policy or custom condoning excessive force.

News articles are generally not admissible to establish the truth of their contents. *See*

13

*United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005). However, news articles may be admissible if offered for other purposes. *Baker*, 432 F.3d at 1211; *see United States v. Michtavi*, 155 Fed. App'x 433, 435 (11th Cir. 2005) (to show articles existed); *see Estate of O'Connor v. United States,* No. 8:12-CV-02070-T-27MA, 2013 WL 1295925, at *2, nt. 8 (M.D. Fla. Mar. 28, 2013), appeal dismissed (Oct. 9, 2013) (to show party had notice of allegations in article); *see Carter v. District of Columbia*, 795 F.2d 116, 126 (D.C. Cir. 1986) (to show notice of pattern of police misconduct).

White and Williams do not offer Exhibits R, S, and U to prove the truth of the matter asserted and only offer the news articles to show that the articles existed and that the City had notice of the incidents the articles discussed to infer a need for additional excessive force training. These uses are not hearsay.

The Defendants argument that the news articles should be stricken because they are not authenticated fails. *See Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1530 (11th Cir. 1993) (finding news articles may be considered at summary judgment even if inadmissible at trial). Further, the AL.com news articles are analogous to traditional newspaper articles and could be found self-authenticating at trial. *See* Fed. R. Evid. 902(6).

### D.    Summary

In summary, as to the Defendants' evidentiary matters, the court **DENIES** the Defendants' motion to strike exhibits L, L1, L2, L3, L4, L5; portions of exhibit M; and exhibits R, S, and U to White and Williams' response to the Defendants' motion for summary judgment.

### IV.    Motion for Summary Judgment

White and Williams sued the City, Mayor Bell, Officers Harris and Smith, and several

14

unserved or fictitious parties under § 1983 for violations of White and Williams' constitutional rights. White and Williams also alleged the Defendants falsely imprisoned, assaulted, and battered them. For the reasons discussed below, the court finds the Defendants are entitled to summary judgment on all of White and Williams' claims.

A.     Facts

The facts below are taken in the light most favorable to White and Williams.

1.     Earlier on November 30, 2012

On the evening of November 30, 2012, beginning at 5:00 p.m., BPD Officer Herman Harris, a member of Mayor William Bell's security detail, drove Mayor Bell to and from several official events in an unmarked black Suburban owned by BPD. BPD Officer Eric Smith, another member of Mayor Bell's security detail, accompanied Officer Harris and Mayor Bell. Officer Harris drove, Officer Smith sat in the front passenger seat, and Mayor Bell sat in the rear seat on the passenger side.

Also on November 30, 2012, plaintiff Justin White drove Deandre Major and plaintiff Latisha Williams around the Smithfield area of Birmingham near Parker High School in his white Lincoln Town Car four-door sedan. White drove, Major sat in the front passenger seat, and Williams sat in the rear seat on the driver's side.

Officers Harris and Smith first saw White's vehicle as it pulled up and stopped at the traffic light on the corner of 8th Avenue and 6th Street, traveling east in the far right lane. A burgundy and gold Suburban driven by Alfred Murphy also stopped at the traffic light next to White's vehicle.

## 2.       The Murphy Shooting

Officer Smith saw a black male fire three shots into the burgundy and gold Suburban

from the passenger side window of White's vehicle. Officer Harris also saw a black male fire at

the burgundy and gold Suburban, heard two shots, and also saw one muzzle flash at 7:30 p.m.

Mayor Bell also saw an individual fire approximately three to five shots from White's vehicle.

White and Williams invoked their Fifth Amendment rights against self incrimination when asked

whether Major shot at the burgundy and gold Suburban and the court infers they witnessed Major

shoot at the burgundy and gold Suburban.[4]

However, a BPD incident/occurrence report ("IO report") completed by BPD Officer

Penn after the Murphy shooting states that the shooting occurred at 9:30 p.m., several hours after

BPD took White and Williams into custody, and states that the shooting occurred on the 1600

block of 8th Avenue North, half a mile from where the Mayor's vehicle encountered White's

vehicle. (Doc. 42-19). Thus, for purposes of summary judgment, taking the conflicting evidence

in the light most favorable to White and Williams, the court assumes that the Murphy shooting

---

[4] The court takes an adverse inference to White and Williams' invocation of the Fifth Amendment because this case is a civil case and White and Williams are not subject to a criminal prosecution for the events of November 30, 2012. Doing so is proper under Eleventh Circuit precedent:

> This Court has held, however, that the trier of fact may take an adverse inference against the parties to a civil action refusing to testify on Fifth Amendment grounds. There is an exception to this rule when a claimant in the civil case is also a defendant in the criminal case and is forced to choose between waiving the privilege and losing the case on summary judgment.

*United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d 1123, 1129 (11th Cir. 1996) (internal citations omitted) (making adverse inference on motion for summary judgment); *see Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) (making adverse inference on motion for default judgment).

16

did not involve the occupants of White's vehicle.

### 3.    The Arkadelphia Road Shooting

After encountering White's vehicle, Officer Smith requested backup. Officer Harris circled the block and eventually wound up behind White's vehicle. White knew that he was being followed, but did not know the Mayor's vehicle belonged to BPD and felt threatened by the Mayor's unmarked vehicle. He did not call 911 or head towards a police station, however. White attempted to evade the Mayor's vehicle by driving around 45 to 50 miles per hour through a residential neighborhood, but he stopped at all stop signs, used his blinkers, and drove carefully. Officer Harris followed White's vehicle onto Arkadelphia Road heading north. Officer Smith advised Officer Harris to stay back a safe distance.

At the corner of 9th Avenue and Arkadelphia Road, a black male passenger in White's vehicle fired one shot at the Mayor's vehicle. Mayor Bell testified that one shot came from White's vehicle and that he saw a muzzle flash. Officer Harris heard a shot, but did not see a muzzle flash. Officer Smith heard a shot, but did not see a shot fired. As previously noted, because White and Williams invoked their Fifth Amendment rights against self incrimination in response to questions about whether Major shot at the Mayor's vehicle, the court infers they witnessed Major shoot at the Mayor's vehicle.

### 4.    The Interstate 59 Shooting

White's vehicle entered the on ramp to Interstate 59 at Arkadelphia Road at a high rate of speed followed by the Mayor's vehicle. White was afraid because he did not know who was following him. Officer Harris continued to follow directly behind White's vehicle, but did not activate the police lights or sirens on the Mayor's vehicle. Officer Smith had already called for

backup, but backup had not yet arrived. Around the 17th street exit, White's steering wheel locked up. Moments later, White's vehicle veered across traffic and crashed into the right side concrete barrier between the 17th Street and 22nd Street exits with the front of White's vehicle facing the concrete barrier.

John Presley Hargrove, III was driving home from Princeton Baptist Medical around 7:30 p.m. and witnessed White's vehicle crash. He stopped his vehicle 80 yards away and saw the Mayor's vehicle come to a stop in the left lane of the interstate about six or sevens seconds later.

After the crash, the parties' and witness' recollections of events vary widely.

### a.   White's Perspective

During the crash, White hit his head on the steering wheel, but remained conscious. White asked everyone in the vehicle if they were ok. The wreck knocked Major unconscious. White saw police lights on the Mayor's vehicle and saw "two dudes standing outside the [Mayor's vehicle]" after the crash. (Doc. 36-7, 18).

White tried to open the door, but the doors remained locked because his vehicle remained in drive. The windows remained up in the vehicle. White put his hand to the door to open it, but quickly let go when he heard gunshots. He then "heard somebody yell something" that "sounded like he said shots fired." (Doc. 36-8, 19). White didn't hear anyone say "surrender" or "put your hands up" and White did not put his hands up.

BPD shot into the vehicle and hit White in the ankle and back. After being shot, White jumped in the backseat for cover until the shooting stopped. White did not see anyone shoot from White's vehicle after the crash.

18

### b.    Williams' Perspective

During the crash, Williams hit the seat in front of her, but remained conscious. Williams heard the air bags deploy and saw smoke. Williams heard shots "right as soon as the car crashed." (36-7, 20). After hearing shots, Williams got down closer to the floor of the vehicle and closed her eyes. Williams did not hear anyone say "show me your hands." (Doc. 36-7, 20). Williams did not see police lights on the Mayor's vehicle.

Williams said the shooting went on for one or two minutes. Williams heard White say he was shot and saw White jump in the backseat.

BPD shot into the vehicle and hit Williams in her knee which she was still in the vehicle. When the shooting stopped, Williams opened the car door and stuck her foot out of the car. She also put her hands up. Williams did not see anyone shoot from White's vehicle after the crash.

### c.    Officers Harris and Smith's Perspective

After the crash, Officers Harris and Smith sat in the Mayor's vehicle for a short time, long enough to watch traffic stop behind the Mayor's vehicle. Officer Smith then exited the passenger side of the vehicle with his .380 pistol drawn and approached White's vehicle to conduct a felony traffic stop. Officer Smith crossed one lane of traffic and attempted to get behind White's vehicle. Officer Harris exited the driver's side of the vehicle and took cover near the front of the Mayor's vehicle.

Officer Smith yelled, "[l]et me see your hands," but the occupants of White's vehicle did not show their hands. (Doc. 36-3, 56). Officer Smith thought the occupants of White's vehicle "were scrambling from the front to the back seat. And it appeared as if they were either going for a weapon or searching for a weapon." (Doc. 36-3, 54-55). Officer Harris also identified himself

19

as a BPD officer and said "[l]et me see your hands." (Doc. 36-1, 47). The occupants of White's vehicle continued to move around and did not show their hands. Officer Harris heard Officer Smith yell "Birmingham police, get out of the car." (Doc. 36-1, 46).

As Officer Smith crossed the interstate about eight or nine feet behind White's vehicle, he heard a shot and saw a muzzle flash from White's vehicle. Officer Harris also heard a shot from White's vehicle and saw an occupant of White's vehicle shoot from the passenger side of the vehicle toward Officer Smith.

Officer Smith told Officer Harris "they [sic] shooting." (Doc. 35, ¶ 47). Officer Smith felt afraid and believed that his life was in danger. Officer Smith then began firing at White's vehicle as he retreated toward Hargrove's vehicle. Officer Smith fired seven shots. Officer Harris also shot at White's vehicle twice.

Officer Smith used Hargrove's passenger door as cover to reload. Officer Smith did not hear any gunshots while reloading. Officer Smith fired two additional shots after reloading because Officer Smith saw the occupants of White's vehicle scrambling inside the vehicle.

Officers Harris and Smith admit they shot White in his back and ankle and shot Williams in her knee while they were still in White's vehicle. Officer Harris stopped firing when the occupants of White's vehicle put their hands in the air. Officer Smith stopped firing when he heard sirens and knew backup had arrived.

### d.    Mayor Bell's Perspective

After the crash, Mayor Bell saw Officer Smith exit the Mayor's vehicle immediately after the vehicle stopped. Mayor Bell heard gunshots. Officer Harris or Officer Smith told Mayor Bell to get down and Mayor Bell leaned down so that his shoulder touched the bench part of the back

seat of the Mayor's vehicle. Mayor Bell saw Officer Harris exit the Mayor's vehicle. Mayor Bell

heard Officer Smith state: "[g]et out of the vehicle. Put your hands up, get out of the vehicle."

(Doc. 36-2, 192). All of these actions happened in less than ten seconds.

Mayor Bell heard gunshots, but did not know where the gunshots originated. Mayor Bell

heard three different guns firing, each with a different volume. Mayor Bell sat back up from time

to time during the gunfire, but did not see Officer Harris, Officer Smith, or anyone in White's

vehicle fire a gun. Mayor Bell heard either Officer Harris or Officer Smith instruct the occupants

of White's vehicle to show their hands or get out of the vehicle again after the shooting ended.

Mayor Bell did not exit the Mayor's vehicle at any time during the shooting.

### e.    Hargrove's Perspective

After the crash, Hargrove began to exit his vehicle to provide first aid to the occupants of

White's vehicle. Hargrove then saw Officer Smith exit the passenger side of the Mayor's vehicle

with his gun drawn. Hargrove changed his mind and decided to stay in his vehicle.

Hargrove heard Officer Smith say "show me your hands, get out of the vehicle." (Doc.

36-10, 6). Hargrove also saw another person exit the Mayor's vehicle.

Hargrove then heard two gunshots and heard Officer Smith yell "they're shooting at us,

they're shooting as us." (Doc. 36-10, 6). Hargrove saw Officer Smith fire his weapon while

crossing lanes of traffic and approaching White's vehicle. Officer Smith began firing about 10 to

12 seconds after exiting the Mayor's vehicle. Hargrove estimated that Officer Smith fired his

weapon four or five times.

Hargrove leaned down in his seat for safety. Officer Smith appeared by Hargrove's

vehicle and Hargrove told Officer Smith to use his passenger side door for cover.

21

Finally, the shooting stopped, but Hargrove did not know why the shooting stopped. Hargrove never saw any occupant of White's vehicle fire a weapon.

**5.     At the Hospital**

After the shooting ended, a uniformed BPD officer who had arrived at the scene pulled Williams out of the car by her jacket, threw her to the ground, and placed her in handcuffs. The officer also placed White in handcuffs. After being handcuffed, BPD questioned White and Williams, but BPD did not read White and Williams their *Miranda* rights.

An ambulance transported White to UAB hospital where UAB staff operated on his two gunshot wounds. White remained at UAB for two weeks and two or three days. He remained handcuffed for two days at UAB. BPD officers escorted White's family members out of UAB on November 30, 2012. On December 1, 2012, White asked to see his family, but BPD officers refused. White saw his family for the first time on December 2, 2012. BPD officers told White that he could not leave UAB until he gave a statement to BPD, but White did, in fact, leave without giving a statement.

An ambulance also transported Williams to UAB. Williams could not stand when the ambulance arrived on Interstate 59. Thus, BPD placed Williams on a gurney and handcuffed her to the gurney. When she arrived at UAB, the ambulance personnel left Williams on a gurney in the hallway for about ten minutes and UAB personnel then moved her to a room. BPD officers remained with Williams. A BPD officer asked Williams if she knew what kind of gun she had been shot with.

Later, Williams spoke with BPD Investigator Jonathan Ross. Investigator Ross told Williams she would need to give a statement to BPD and instructed her to mention the shooting

and the "fourth person" in the vehicle when interviewed by BPD.

Williams entered surgery for her gunshot wound on December 1, 2012, around 5:52 p.m. Two BPD officers remained with Williams after her surgery and accompanied her to get CT scans and X-rays. Williams complained after her surgery about the tightness of her handcuffs to BPD Officer Law.

Later, Williams gave a statement to BPD Investigator Jeff Steele while medicated. BPD released Williams from handcuffs after she gave her statement. BPD did not allow Williams to make any telephone calls until after she spoke with Investigator Steele. Williams asked to speak to her mother during her interview with Investigator Steele. However, BPD and UAB officials did not allow Williams to talk with or see her mother until December 2, 2012. A UAB nurse told Williams' mother by phone that she would be arrested if she attempted to see her daughter.

UAB discharged Williams on December 6th or 7th. During her discharge, a BPD officer told Williams she might have to come with him to the Birmingham City Jail. Half-an-hour later, after the BPD officer made a phone call, Williams left UAB.

### 6.    The Investigation

After the shooting ended, Officers Harris and Smith waited at the scene until instructed to leave. BPD Sergeant Karen Snider, the first evidence technician at the scene, arrived at 8:15 p.m. Sergeant Snider photographed Officers Harris and Smith together at least 13 minutes after the shooting. BPD took Officers Harris and Smith to police headquarters separately and placed them in separate rooms. An evidence technician took Officers Harris and Smith's clothes, weapons, and ammunition.

Sergeant Snider did not find a weapon in White's vehicle. Besides Officers Harris and

Smith's weapons, Sergeant Snider did not find another weapon *on* I-59; BPD did recover a Ruger .40 caliber gun *below* the interstate where White's vehicle crashed. Sergeant Snider did not find any .40 caliber shell casings on or below Interstate 59. BPD Officer Roxann Murry found a bullet jacket matching the Ruger .40 caliber at the intersection of 8th Avenue and 6th Street.

The Mayor's vehicle did not have any bullet holes in it, but White's vehicle had 11 bullet holes in it. Sergeant Snider also found multiple .380 casings behind White's vehicle.

BPD listed White and Williams as suspects on IO reports for the Interstate 59 shooting. Major was ultimately charged with attempted murder, but White and Williams were not charged with any crimes related to the events of November 30, 2012. Investigator Ross later contacted Williams and told her not to file a civil lawsuit against the City because BPD could make her look like a criminal.

BPD and the Alabama Bureau of Investigation conducted investigations into the shooting. BPD placed Officers Harris and Smith on paid administrative leave for six months after the shooting. BPD held a disciplinary hearing for Officer Smith and he received two letters of reprimand for failure to properly certify his weapon. BPD did not reprimand Officer Harris for the shooting.

Officer Smith has worked for BPD for 19 years. He attended the police academy and holds an Alabama Peace Officers Standards and Training certification. He has attended continuing education courses throughout his career in areas related to the use of force. Officer Smith previously received letters of censure in 1998 and 2001 and received an oral reprimand in 2004.

Officer Harris has worked for BPD for 20 years. He attended the police academy and also

24

holds an Alabama Peace Officers Standards and Training certification. He has attended

continuing education courses throughout his career in areas related to the use of force. Officer

Harris previously received a reprimand before 2007 for using hands on a handcuffed suspect**.**

> BPD has polices for
>
> use of force, the firearms review committee, firearms and ammunition, back-up
> unit(s) roles and responsibility, serious injury or death involving police officer,
> traffic patrol techniques, vehicle pursuit policy, incident reports, detectives,
> investigations, juvenile arrests, temporary restraining devices, felony arrest time
> extension request procedures, guarding prisoners at hospitals, police officer's oath
> of office, departmental goals and objectives, duty requirements, and laws and
> ordinances.

(Doc. 36-12, 2).

## B.    Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary

judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a

district court reviews a motion for summary judgment, it must determine two things: (1) whether

any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to

judgment as a matter of law. *Id.*

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering

evidence showing no dispute of material fact or by showing that the non-moving party's evidence

fails to prove an essential element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial.*'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e) ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254. The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *see Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000). "Even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274,1282 (11th Cir. 1999). The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

**C.    Analysis**

**1.    Fictitious and Unserved Defendants**

First, the court must clarify who White and Williams have sued. In addition to the City, Mayor Bell, Officer Harris, and Officer Smith, White and Williams mention other individuals in their complaints.

27

### a.    Williams

Williams sued Fictitious Defendants C, D, E, and F. In paragraph six of her complaint

Williams describes Defendant C by a "distinctive and mid arm length tattoo that was visible to

[Williams]" and said he "fired his handgun into White's vehicle at least two times," "used

excessive force," and interrogated Williams while she remained handcuffed to a gurney. (Case

No. 2:13-cv-01006-cv-KOB, Doc. 6, ¶ 6, ¶ 38, ¶ 41, ¶ 45, ¶ 49). Williams describes Defendants

D, E, and F as ones who "falsely restrained the personal liberty of [Williams] from November 30,

2012 through December 1, 2012 by handcuffing [Williams] to a hospital bed for over 12 hours

while at the same time denying visitation to [Williams' family]." (Case No. 2:13-cv-01006-cv-

KOB, Doc. 6, ¶¶ 7-9). Williams sued Defendant C under § 1983 and sued Defendants C, D, E,

and F under state law causes of action.

"As a general matter, fictitious-party pleading is not permitted in federal court" unless

"the plaintiff's description of the defendant is so specific to be at the very worst, surplusage."

*Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (internal quotation marks omitted).

Sometimes a plaintiff truly sues a fictitious party and other times a plaintiff actually sues a real

party under a fictitious name for various reasons, such as when a plaintiff fears using a real name

or when a description adequately describes the party. *See Dean v. Barber*, 951 F.2d 1210,

1215-16 (11th Cir. 1992). Represented parties are given less leeway to utilize fictitious party

pleading than *pro se* plaintiffs. *Id*. Further, failure to use discovery tools to discover information

necessary to substitute a fictitiously named party militates against sufficient identification. *See*

*Moulds v. Bullard*, 345 Fed. App'x 387, 390 (11th Cir. 2009).

Naming "John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute" in a

complaint plus a later reference in a letter to "Mr. Mitchell" is insufficient to name a party. *See Richardson*, 598 F.3d at 738. Further, naming John Does in the complaint and "completely [failing] to describe some of those officers" and giving "general descriptions of others" including "the duty stations to which they were assigned" is insufficient. *Moulds*, 345 Fed. App'x at 390. In contrast, providing an incorrect job title that appears to correspond to a particular position in an organization *along with a discovery request for the name of the defendant* and a description sufficient to allow service of process is sufficient. *See Dean*, 951 F.2d at 1215-16.

Williams fails to sufficiently describe Defendants C, D, E, and F and the general rule against fictitious party pleading applies. Williams only describes Defendant C with *any* degree of particularity. However, Williams is represented by counsel and could have used available discovery tools to identify and substitute the appropriate BPD officers, but failed to do so. Thus, Williams claims against Defendants C, D, E, and F fail and they will be dismissed with prejudice from the case.

### b.    White

White has not sued any parties in addition to the City, Officer Harris, Officer Smith, and Mayor Bell. However, White mentions Officer Pinkney Toonson, Officer Joshua Camp, and Officer Eric Henderson in his complaint. White does not claim that he has "sued" the three officers but does state he "was placed in fear and apprehension of being harmed" by the three officers and that the three officers intentionally handcuffed White to a hospital bed for two days. (Doc. 17, ¶ 76, 83).

The Defendants argue that any claims against Officers Toonson, Camp, and Henderson should be dismissed for failure to join the officers to the lawsuit or personally serve the officers.

29

The court agrees. Because White failed to personally sue or serve these putative defendants, they are not parties to the lawsuit.

### 2.     § 1983 Official Capacity

White and Williams sued the City, Mayor Bell and Officers Harris and Smith in their official capacity alleging that the Defendants used or condoned the use of excessive force.

### a.     The City

White and Williams sued the City directly for Officers Harris and Smith's alleged use of excessive force. (Doc. 17, 9-16, ¶¶ 48-68). However, as explained below, the City is not liable because the City did not maintain a policy or custom condoning excessive force. In fact, the City has a policy *against* the use of excessive force.

A municipality is not vicariously liable under § 1983 for the actions of its police officers. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Instead, "[i]t is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (internal quotation marks omitted). Thus, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that [his or her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Ludaway v. City of Jacksonville, Fla.*, 245 Fed. App'x 949, 951 (11th Cir. 2007). A custom is a settled and permanent practice with the force of law. *Id.* Deliberate indifference to a

30

constitutional right requires more than negligence; rather it requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

A "persistent and wide-spread practice" demonstrates a policy or custom with deliberate indifference to the plaintiff's constitutional rights. *See Ludaway*, 245 Fed. App'x at 951 (internal citations omitted). Generally, a plaintiff must show multiple similar, past, meritorious complaints against a police force to prove a custom condoning excessive force. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *see Ludaway*, 245 Fed. App'x at 952.

For example, in *Mercado*, the plaintiff claimed excessive force when police officers shot him in the head with a non-fatal round of ammunition. *See* 407 F.3d at 1155. The Eleventh Circuit found that the plaintiff could not base his claim of a custom condoning excessive force on other cases filed against the City of Orlando involving allegations of excessive force because those cases were not "*substantially similar* to the case at hand." *Id.* at 1162 (emphasis added). Further, in *Ludaway*, the plaintiff presented evidence of 170 complaints of excessive force against the Jacksonville Sheriff's Office filed between January 2004 and December 2005. *See* 245 Fed. App'x at 950. However, this evidence did not show a custom condoning excessive force because *only 10 claims* of excessive force were *substantiated* and the Sheriff's Office either disciplined the officers in those cases or the officers resigned. *Id.* at 952.

White and Williams do not dispute that the City does not have a *policy* condoning excessive force or that BPD has polices for

> use of force, the firearms review committee, firearms and ammunition, back-up
> unit(s) roles and responsibility, serious injury or death involving police officer,
> traffic patrol techniques, vehicle pursuit policy, incident reports, detectives,
> investigations, juvenile arrests, temporary restraining devices, felony arrest time

31

extension request procedures, guarding prisoners at hospitals, police officer's oath
of office, departmental goals and objectives, duty requirements, and laws and
ordinances.

(Doc. 36-12, 2).

Rather, White and Williams present two basic arguments that a *custom* of using excessive

force exists. First, White and Williams point to the following instances of alleged excessive force

by BPD as evidence of a custom of allowing excessive force:

1. A claim of excessive force on March 20, 2011 against BPD for striking a suspect whose hands were raised;
2. Certification of a class complaint against BPD for alleged excessive force in the use of pepper spray against minors;
3. An October 2012 jury verdict against BPD for excessive force in hitting a suspect handcuffed in a police vehicle;
4. The fact that Investigator Steele has investigated eight shootings involving officers in his career;
5. The fact that BPD's firearms review board met monthly;
6. The fact that Sergeant Snider has investigated five or six shootings involving officers in her career;
7. Officer Harris' lack of knowledge about the excessive force policy; and
8. Chief Roper's statement that the excessive force training regimen has not changed since 2006.

White and Williams' evidence is insufficient to show a custom condoning excessive

force. A plaintiff must show a custom condoning excessive force through multiple similar, past,

meritorious complaints of excessive force. *See Mercado*, 407 F.3d at 1162; *see Ludaway*, 245

Fed. App'x at 952. The other incidents proffered by White and Williams are too different to

create a custom.

The March 20, 2011 incident; the October, 2012 jury verdict; and the pepper spray class

certification do not involve claims of lethal force involving firearms. Additionally, the fact that

Investigator Steele and Sergeant Snider have periodically investigated police shootings over their

careers does not show a custom condoning excessive force. White and Williams present no

evidence about the results of those investigations or even over how long a period of time those investigations occurred. Without more information or context, the court cannot infer a custom condoning excessive force.

Finally, the fact that the firearms review board meets monthly, the statement from Chief Roper about the excessive force training, and Officer Harris' "lack of knowledge" about the excessive force policy are, if anything, evidence of a custom or policy *against* the use of excessive force. The frequency with which the firearms review board met is evidence of the City's attempt to *control* the use of excessive force. Similarly, Chief Roper's statement regarding the use of force training shows that BPD *actually provided* the training to BPD officers. Further, Officer Harris' "lack of knowledge" about the excessive force training is based on Officer Harris' testimony that he could not remember exact details about the excessive force training that BPD *actually provided* to Officer Harris. White and Williams have simply not shown the multiple similar, past, meritorious complaints of excessive force necessary to show a custom condoning excessive force in the use of firearms.

Alternatively, White and Williams argue that the City condones excessive force based on evidence regarding Officers Harris and Smith's allegedly deficient training. The Supreme Court has hypothesized that "the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious' that *the failure* to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 391, n. 10 (emphasis added). Here, the City's alleged failure to adequately train Officers Harris and Smith in the proper use of deadly force could, hypothetically, be evidence of a custom condoning excessive force even without multiple similar, past, meritorious incidents.

33

However, the City has not abdicated its responsibility to train Officers Harris and Smith. Rather, the City has multiple policies related to the use of force. (Doc. 36-12, 2). Officers Harris and Smith have attended continuing education classes throughout their career on similar topics.

Further, Officer Smith's reprimand for failure to properly certify his weapon is irrelevant. Officer Smith certified his .380 in 2011. Smith failed to certify his .380 in 2012 and instead certified a different weapon. However, even if the City knew that Officer Smith's failure to certify his weapon would cause him to engage in excessive force, that knowledge is insufficient to show a custom tolerating excessive force. BPD punished Officer Smith for violating its policy *against* the use of excessive force when, after the investigation into the shooting, it issued two letters of reprimand to Officer Smith for failure to properly certify his weapon. A plaintiff "must show that the training program itself is deficient, and not just that a particular officer was inadequately trained." *See City of Canton*, 489 U.S. at 390-91.

In summary, White and Williams have failed to present evidence that the City had a policy or custom that allowed or condoned excessive force that constituted deliberate indifference to White and Williams' constitutional rights. Thus, White and Williams' § 1983 official capacity claims against the City fail.

b.    **Mayor Bell and Officers Harris and Smith**

White and Williams also sued Mayor Bell and Officers Harris and Smith in their official capacities based on Officers Harris and Smith's alleged use of excessive force. (Doc. 17, 9-16, ¶¶ 48-68). However, White and Williams' claims against Mayor Bell and Officers Harris and Smith in their official capacities fail under the facts of this case.

"A § 1983 action against a governmental official in his *official* capacity is deemed a suit

34

against the entity that he represents" and is "essentially a complaint against the City." *Ludaway*, 245 Fed App'x at 951 (emphasis in original and internal quotation marks and citations omitted). "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

Thus, White and Williams' complaints against Mayor Bell and Officers Harris and Smith as the municipality's agents are insufficient "under the rubric of municipal liability" discussed above in Section IV.C.2.a. *See Ludaway*, 245 Fed App'x at 951.

### 3.      § 1983 Individual Capacity

White and Williams also sued Mayor Bell and Officers Harris and Smith in their individual capacities alleging that Mayor Bell and Officers Harris and Smith used or condoned the use of excessive force against them. White's and Williams' complaints allege that Officers Harris and Smith (1) followed White's vehicle too closely; (2) caused White's vehicle to crash; (3) failed to properly use police lights or sirens; (4) failed to give warnings before firing their weapons; (5) fired weapons at White and Williams; and (6) handcuffed White and Williams. (Doc. 17). The Defendants argue that White and Williams' individual capacity claims fail because Mayor Bell and Officers Harris and Smith are entitled to qualified immunity. For the reasons discussed below, the court agrees.

Qualified immunity protects government officials performing discretionary functions from individual capacity suits unless the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S.

35

730, 739 (2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted).

"The applicability of qualified immunity is a question of law to be decided by the court." *Willingham v. Loughnan*, 261 F.3d 1178, 1184 (11th Cir. 2001). To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. A two-prong test determines whether qualified immunity is appropriate. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the *Saucier* analysis may be performed in any order). First, the court asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier*, 533 U.S. at 201). Second, "[i]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Gonzalez*, 325 F.3d at 1234.

a.    **Discretionary Duty**

Mayor Bell and Officers Harris and Smith must first show that they engaged in discretionary duties on the night of the shooting. *See Vinyard*, 311 F.3d at 1346. Government

officials act within the scope of their discretionary authority if "the actions were (1) undertaken pursuant to the performance of [their] duties and (2) within the scope of [their] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (internal citations and quotation marks omitted).

### i.    Officers Harris and Smith

Officers Harris and Smith engaged in discretionary duties because they worked as on-duty police officers on November 30, 2012 in their role as the Mayor's security detail.

A police officer carries out his discretionary authority when he acts "with power possessed by virtue of the defendant's employment with the governmental entity" as opposed to "acting only as a private individual." *Bouye v. Marshall*, 102 F. Supp. 2d 1357, 1362 (N.D. Ga. 2000) aff'd sub nom. *Bouye v. Gwinnett Cnty.*, 265 F.3d 1063 (11th Cir. 2001). "Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, *would have fallen within his legitimate job description*." *Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004) (emphasis added). Police officers often work in a security role and even when police officers work as security for *private entities* while *off-duty* they may carry out discretionary duties if the act is "related to the performance of . . . police duties and . . . carried out pursuant to authority conferred by the state." *Bouye*, 102 F. Supp. 2d at 1362.

For example, a police officer working off-duty as an apartment complex security guard carried out a discretionary duty when he looked like a police officer by wearing his police sweatshirt and bullet-proof vest and displaying his badge, and acted like a police officer by patrolling the apartment complex and investigating suspicious behavior. *See Bouye*, 102 F. Supp.

37

2d at 1362; *see Traver v. Meshriy*, 627 F.2d 934, 937-38 (9th Cir. 1980) (finding off-duty police officer working as a security teller through police department's secondary hiring program, with primary responsibility in the event of a crime to the police department rather than the bank, exercised discretionary duty when he detained customer).

Officers Harris and Smith looked like police officers on November 30, 2012. Officers Harris and Smith were not off-duty working for a private entity during their encounter with White and Williams. Rather, they were on-duty BPD police officers working as police security for Mayor Bell. Officers Harris and Smith looked like police officers because they wore BPD uniforms, carried BPD issued weapons, and had their BPD badges. Further, although the Mayor's vehicle was unmarked and Officers Harris and Smith did not use their sirens at all and did not use their police lights until after White wrecked, the vehicle was an official BPD vehicle.

Officers Harris and Smith also acted like police officers. The Mayor's security detail is an official part of BPD. The security detail's "function is to provide security for the mayor, which includes transportation, which includes site visits, doing advance work, making sure there's no obvious threats to the mayor as he conducts the business of the City." (Doc. 42-16, 27). The court infers that on November 30, 2012, an occupant of White's vehicle shot at the Mayor's vehicle with Mayor Bell inside. *See Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d at 1129; *see Eagle Hosp. Physicians, LLC*, 561 F.3d at 1304. Officers Harris and Smith responded by (1) reporting the shooting, (2) monitoring the location of the shooter by continuing to follow White's vehicle, and, finally, (3) attempting to apprehend the shooter. These actions are police actions within Officers Harris and Smith's discretion.

White and Williams argue Officers Harris and Smith should have used the Mayor's

38

vehicle's police lights and sirens before the crash and should have announced themselves as police officers upon arriving at White's crashed vehicle. However, the parties' subjective viewpoint or beliefs regarding how the police should have acted is irrelevant. *Accord Maestas v. Lujan*, 351 F.3d 1001, 1011 (10th Cir. 2003) (finding subjective beliefs regarding government official's discretionary duties irrelevant). That *White and Williams* did not know that the Mayor's vehicle belonged to BPD or that Officers Harris and Smith worked for BPD is irrelevant. Similarly, White and Williams' belief that Officers Harris and Smith should have taken Mayor Bell home instead of pursuing White's vehicle is irrelevant. Officers Harris and Smith, on-duty BPD officers, chose to pursue and apprehend a vehicle from which they witnessed someone shoot at an official BPD vehicle. These actions certainly fall within their job description as police officers.

### ii.    Mayor Bell

Mayor Bell also engaged in discretionary duties on the night of the shooting when he was returning home from official city events. Mayor Bell's actions on November 30, 2012, attending official city events, fell within his job description as Mayor. *See Holloman*, 370 F.3d at 1266. White and Williams do not contest that Mayor Bell engaged in discretionary duties on November 30, 2012.

### b.    Violation of Constitutional Right

Because the Defendants have shown that Mayor Bell and Officers Harris and Smith engaged in discretionary functions within their job duties on November 30, 2012, White and Williams must show that qualified immunity is not available because Mayor Bell and Officers Harris and Smith violated White and Williams' constitutional rights.

All parties agree that White and Williams have the Fourth Amendment right to be "free from excessive force in the course of an investigatory stop or other 'seizure' of the person." *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). To establish an excessive force claim, a plaintiff must first show the government "seized" the plaintiff within the meaning of the Fourth Amendment. *See Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). A Fourth Amendment seizure exists when "a governmental termination of freedom of movement [occurs] through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

If a plaintiff is seized, the court must determine "whether the force used to effectuate the seizure was reasonable." *Beshers*, 495 F.3d at 1266. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee*, 284 F.3d at 1197 (internal quotation marks omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). "Reasonableness cuts both ways, however. . . . [The court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011).

### i.    Officers Harris and Smith's Chase of White's Vehicle

White and Williams claim that Officers Harris and Smith engaged in excessive force by causing White's vehicle to crash. (*See* Doc. 17, ¶¶ 59-66). Taking the facts in the light most favorable to White and Williams, Officers Harris and Smith observed an occupant of White's

vehicle shoot at the Mayor's vehicle on Arkadelphia Road. Officers Harris and Smith then approached White's vehicle quickly on Interstate 59 without police lights or sirens. White's steering wheel locked up and he lost control of the vehicle, crashing into the side wall of the Interstate 59.

"The Fourth Amendment covers only 'searches and seizures,' neither of which took place here." *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). A Fourth Amendment violation can only conceivably occur if police officers stop a fleeing suspect "*through means intentionally applied.*" *Id.* at 844 (emphasis in original). "No Fourth Amendment seizure would take place where a pursuing police car . . . accidentally stopped the suspect by crashing into him." *Id.* (internal quotation marks omitted).

Here, no evidence indicates that Officers Harris and Smith crashed into or caused White's vehicle to crash. Instead, White's vehicle crashed because White's steering wheel locked up. However, even if Officers Harris and Smith caused White's vehicle to crash by following too closely, tailgating, or chasing White's vehicle, no excessive force claim exists because no seizure occurred "through means intentionally applied." *Lewis*, 523 U.S. at 844.

Also, Officers Harris and Smith did not violate White and Williams substantive due process rights under the Fourteenth Amendment when White's vehicle crashed. All excessive force claims are properly reviewed under the Fourth Amendment's objective reasonableness standard rather than under a substantive due process standard. *See Graham*, 490 U.S. at 388**.**

**ii.    Officers Harris and Smith's Use of Deadly Force**

White and Williams argue that Officers Harris and Smith used excessive force when they fired their weapons at White and Williams without announcing their presence or using police

lights or sirens. Taking the facts in the light most favorable to White and Williams, Officers Harris and Smith arrived at White's crashed vehicle and illuminated their police lights,[5] but left their sirens off. Officers Harris and Smith exited the Mayor's vehicle with their weapons drawn and fired 11 shots at White's vehicle without saying anything.

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Deadly force is allowed when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). However, "whether the force used to effect a particular seizure is 'reasonable,' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. (quoting *Garner*, 471 U.S. at 8). Governmental interests include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Thus, the court must consider the objective reasonableness of Officers Harris and Smith's use of deadly force in light of the totality of the circumstances surrounding their interaction with White and Williams. The court will consider a number of factors.

First, the court must consider the extent of force used by Officers Harris and Smith.

---

[5]White testified that he saw police lights after the crash but not before. Williams testified that she had her eyes closed after the crash and did not see police lights before the crash.

White and Williams argue that Officers Harris and Smith fired into White's vehicle an excessive number of times without warning. Officers Harris and Smith fired their weapons at White's vehicle 11 times, hitting White twice and Williams once. Officer Harris fired twice. Officer Smith fired seven times, reloaded, and fired two more times.

Under controlling precedent, the court finds the number of shots fired is objectively reasonable. In *Plumhoff v. Rickard*, police chased the plaintiff from West Memphis, Arkansas to Memphis, Tennessee ending with the plaintiff's vehicle pinned by police vehicles. *See* --- U.S. ---, 134 S. Ct. 2012, 2017-18 (2014). The plaintiff continued to try to escape using his vehicle as a weapon and police officers fired three shots into the plaintiff's vehicle. The plaintiff freed his vehicle and fled down a side street. Police officers fired 12 more shots as the plaintiff fled, resulting in the plaintiff and his passenger's death. *Id.* The police officers' initial shots were justified because the plaintiff failed to surrender. *Id.* at 2022. Further, the Supreme Court noted "[i]t stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.*

Officers Harris and Smith faced a crashed vehicle whose occupant had fired a weapon at the Mayor's vehicle moments earlier. Just like in *Plumhoff*, Officers Harris and Smith could reasonably use force until they neutralized the threat.

Additionally, Officer Smith's two additional shots after reloading is reasonable. In contrast to *Plumhoff*, White and Williams were not fighting the police or attempting to escape when Officer Smith fired his last two shots. Instead, Officer Smith detected (and White and Williams admitted) movement within White's vehicle *after* Officers Harris and Smith's initial volley. Officer Smith reasonably believed that White and Williams may have been searching for

a weapon in the vehicle after the initial volley. Further, White and Williams made no attempt to surrender during the period of time while Officer Smith reloaded even though Officers Harris and Smith were not shooting. *See Plumhoff*, 134 S. Ct. at 2022 ("This would be a different case if [the police] had initiated a second round of shots after an initial round has clearly incapacitated [the plaintiff] and had ended any threat of continued flight, or if [the plaintiff] had clearly given himself up.").

Further, Officers Harris and Smith's failure to identify themselves is objectively reasonable. In *Carr v. Tatangelo*, the police shot a plaintiff from a hidden location. 338 F.3d 1259, 1263 (11th Cir. 2003). The plaintiff said he did not know who shot him (though the police officers said they screamed "police" immediately before shooting). *Id.* at 1264, nt. 6. The Eleventh Circuit found that the police did not use excessive force even if no warning occurred. *Id.* at 1269.

Here, Officers Harris and Smith did not identify themselves but White did see the police lights on the Mayor's vehicle after the crash. However, White and Williams failed to surrender despite the inference that an occupant of their vehicle fired at the Mayor's vehicle only moments before. Officers Harris and Smith did not act unreasonably even though they failed to identify themselves as BPD officers.

In addition to the extent of force used by Officers Harris and Smith, the court must consider a second factor–the severity of any crimes related to Officers Harris and Smith's use of force. White and Williams have not been charged with any crimes stemming from their conduct on November 30, 2012. However, Major, White and Williams' companion, was charged with attempted murder. Further, an occupant of White's vehicle shot at the Mayor's vehicle before the

44

crash. An objectively reasonable police officer would believe that he pursued a dangerous criminal at the time of the crash.

A third factor the court must consider is the threat of physical harm to Officers Harris and Smith and others. White and Williams argue that they were unarmed and did not fire any weapons at the Mayor's vehicle on Interstate 59 and, thus, Officers Harris and Smith used excessive force against them. Whether a plaintiff actually possessed or used a deadly weapon is not dispositive if the police officer *subjectively believes* a plaintiff has a weapon. *See Carr*, 338 F.3d at 1269.

In *Carr*, police hid in bushes near a house with the plaintiff inside. *See* 338 F.3d at 1263. The plaintiff heard a noise in the bushes and threw a rock into the bushes. The plaintiff then took his sunglasses off his head, folded them up, and placed them in his pocket. *Id.* The police heard the "click-clack" noise of the folding sunglasses and thought the plaintiff had chambered a round in a weapon. *Id.* at 1264. The police also mistakenly thought the plaintiff pointed a weapon at them. The police shot at the plaintiff multiple times. The Eleventh Circuit found that the police officers did not use excessive force because the police officers did not fire until they *thought* they heard the chambering of a bullet and pointing of a gun. *Id.* at 1269. Though mistaken, the police were not liable because "[a] reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." *Id.*

Similarly, whether White, Williams, or Major actually had a weapon on Interstate 59 is irrelevant. What matters is that Officers Harris and Smith thought an occupant of White's vehicle had shot at them on Arkadelphia Road shortly before the crash, and that Officers Harris and Smith believed the occupants of White's vehicle still had access to a weapon. White and

45

Williams both admit movement occurred in the vehicle after the crash. Officers Harris and Smith could reasonably think that an occupant of White's vehicle reached for a weapon. Officers Harris and Smith, faced with these unknown variables, acted objectively reasonably.

This case is not like *Lundgren v. McDaniel*, where a jury could have found that police officers had absolutely no provocation to fire their weapons. *See* 814 F.2d 600, 603 (11th Cir. 1987). Here, through the adverse inference that arises from White and Williams' invocation of the Fifth Amendment, White and Williams corroborate Officers Harris and Smith's belief that an occupant of White's vehicle fired at the Mayor's vehicle on Arkadelphia Road. White's vehicle then raced onto Interstate 59 and crashed moments later. Williams heard Officers Harris and Smith's shots "right as soon as the car crashed." (Doc. 36-7, 20). Therefore, Officers Harris and Smith acted objectively reasonably in firing their weapons.

A fourth factor the court must consider is whether White and Williams actively resisted arrest or attempted to evade arrest by flight. White and Williams argue that Officers Harris and Smith used excessive force because the crash immobilized White and Williams. Whether White and Williams could exit their vehicle to surrender is irrelevant. In *Mongeau v. Jacksonville Sheriff's Office*, a plaintiff crashed his vehicle after committing several felonies and engaging in a high speed police chase. *See* 197 Fed. App'x 847, 848 (11th Cir. 2006). The plaintiff could not exit the vehicle because his seatbelt jammed, he was semi-unconscious, and he was in shock. The plaintiff could not keep his hands raised because of his injuries. *Id.* The Eleventh Circuit found the plaintiff's inability to exit the vehicle or raise his hands irrelevant in determining whether the police officers used reasonable force. The police officer had a reasonable fear that the plaintiff was dangerous, based on his prior acts. *Id.* at 850.

46

White and Williams remained inside the crashed, immobile vehicle when Officers Harris and Smith fired on the vehicle. White tried to exit the vehicle but could not because the vehicle's doors remained locked and the vehicle remained in drive. Williams did not try to exit the vehicle until after Officers Harris and Smith stopped firing even though Officers Harris and Smith were not shooting while Officer Smith reloaded. Williams and White both testified that they could have (and eventually did) open the doors to the vehicle. Their delay in exiting does not make Officers Harris and Smith's use of force unreasonable. An occupant of White's vehicle shot at the Mayor's vehicle only moments earlier on Arkadelphia Road. Officers Harris and Smith did not have to wait to see how the occupants of White's vehicle would react after the crash before using force.

A fifth factor the court will consider is the physical evidence at the scene. White and Williams argue that discrepancies between the physical evidence at the scene and Officers Harris and Smith's account of the shooting raise genuine issues of material fact about the reasonableness of Officers Harris and Smith's actions. When the physical evidence found at the scene of a shooting completely refutes the police officer's description of events, a factual dispute exists and a jury can find the police officer's actions unreasonable. *See Scheuerman v. City of Huntsville, AL*, 499 F. Supp. 2d 1205, 1222 (N.D. Ala. 2007).

White and Williams argue that the only bullet casings found at the scene matched Officers Harris and Smith's weapons and, thus, a jury could find Officers Harris and Smith's version of events unreasonable. However, Officers Harris and Smith based their rationale for the use of force only partially on their assertion that an occupant of White's vehicle fired at the Mayor's vehicle on Interstate 59. Officers Harris and Smith originally pursued and fired at

47

White's vehicle because an occupant of White's vehicle shot at the Mayor's vehicle on Arkadelphia Road. White and Williams corroborated, through their invocation of the Fifth Amendment, that an occupant of White's vehicle fired at the Mayor's vehicle on Arkadelphia Road. Even without corroborating physical evidence, Officers Harris and Smith used objectively reasonable force based on the undisputed shooting on Arkadelphia Road.

Finally, a sixth factor the court will consider is the temporal proximity between Officers Harris and Smith's rationale for the use of force–the shooting on Arkadelphia Road–and Officers Harris and Smith's application of force. White and Williams argue that the passage of time between the shots fired on Arkadelphia Road and Officers Harris and Smith's use of force on Interstate 59 makes the use of force unreasonable. Close temporal proximity between a plaintiff's act of violence towards a police officer and the police officer's response makes the police officer's use of force more reasonable. *See Willingham*, 261 F.3d at 1187. In *Willingham*, a police officer shot a woman mere moments after she attempted to kill another police officer. *Id.* Though the woman was then unarmed, the Eleventh Circuit held that the police officer reasonably used force because police officers must often make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 1186.

Similarly, an occupant of White's vehicle shot at the Mayor's vehicle, the vehicle raced onto Interstate 59, and crashed moments later. Williams heard shots "right as soon as the car crashed." (Doc. 36-7, 20). Officers Harris and Smith made a quick judgment to use force to subdue the occupants of White's vehicle. While they, perhaps, could have ascertained whether the occupants of White's vehicle were incapacitated before firing, Officers Harris and Smith were "hampered by incomplete information and forced to make a split-second decision between

48

action and inaction in circumstances where inaction could prove fatal." *Mongeau*, 197 Fed.

App'x. at 850.

In summary, "[i]n a split-second, rapidly escalating situation involving perceived deadly

force, coupled with [their] police response training, [Officers Harris and Smith] acted in an

objectively reasonable manner to the apparent imminent threat to [Mayor Bell and Officers

Harris and Smith] to save [their lives]." *Carr*, 338 F.3d at 1269. The totality of the circumstances

shows that Officers Harris and Smith did not violate the Fourth Amendment rights of White and

Williams.

Also, Officers Harris and Smith did not violate White and Williams' substantive due

process rights under the Fourteenth Amendment when Officers Harris and Smith shot White and

Williams. All excessive force claims are properly reviewed under the Fourth Amendment's

objective reasonableness standard rather than under a substantive due process standard. *See*

*Graham*, 490 U.S. at 388.

### iii.    Mayor Bell's Supervision

White and Williams also argue that Mayor Bell violated White and Williams'

constitutional rights as Officers Harris and Smith's supervisor. A supervisor may be liable for his

subordinate's constitutional violations in several different ways:

> [S]upervisory liability under § 1983 occurs either when the supervisor *personally participates* in the alleged unconstitutional conduct or when there is a *causal connection* between the actions of a supervising official and the alleged constitutional deprivation. The necessary causal connection can be established when a *history of widespread abuse* puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively the causal connection may be established when a supervisor's custom or policy . . . result[s] in *deliberate indifference* to constitutional rights or when facts support an inference that the supervisor *directed* the subordinates to act unlawfully or knew that the subordinates would act unlawfully and *failed to stop them* from doing so.

49

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (emphasis added and internal

quotation marks omitted). However, "[t]he standard by which a supervisor is held liable in [his]

individual capacity for the actions of a subordinate is extremely rigorous." *Id.*

Here, no evidence indicates that Mayor Bell personally participated in Officers Harris and

Smith's chase of White's vehicle or use of force against White and Williams beyond Mayor Bell

passively occupying the Mayor's vehicle. Further, no history of widespread abuse or custom or

policy resulting in deliberate indifference to White and Williams' constitutional rights causally

connects Mayor Bell to Officers Harris and Smith's actions. No evidence exists that Mayor Bell,

in his capacity as a supervisor, has previously ever witnessed a chase or use of force. Finally, no

evidence exists that Mayor Bell directed Officers Harris and Smith to do anything after Mayor

Bell and Officers Harris and Smith encountered White's vehicle or that Mayor Bell knew

Officers Harris and Smith planned to act unlawfully and failed to stop them.

Thus, Mayor Bell did not violate White and Williams' constitutional rights.

### c.      Right Clearly Established at Time of Conduct

Finally, if White and Williams could show a violation of a constitutional right by Mayor

Bell or Officers Harris and Smith, the right must have been clearly established on November 30,

2012 for Mayor Bell and Officers Harris and Smith to be liable. *See Gonzalez*, 325 F.3d at 1234.

"[A] defendant cannot be said to have violated a clearly established right unless the right's

contours were sufficiently definite that any reasonable official in the defendant's shoes would

have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. "In other words, existing

precedent must have placed the statutory or constitutional question confronted by the official

beyond debate." *Id.* (internal quotation marks omitted).

50

Here, however, because Mayor Bell and Officers Harris and Smith did not violate White and Williams constitutional rights, the court need not determine whether any constitutional right was clearly established on November 30, 2012. *See Pearson*, 555 U.S. at 236 (holding that courts are not required to undertake both prongs of the *Saucier* analysis if outcome is clear on one prong of the analysis).

**d.    Conclusion**

In summary, Officers Harris and Smith are not liable individually under § 1983 because qualified immunity applies. Officers Harris and Smith engaged in discretionary duties on November 30, 2012 because Officers Harris and Smith looked and acted like police officers while working as on-duty BPD officers in Mayor Bell's security detail. Further, Officers Harris and Smith did not violate White and Williams' constitutional rights by using excessive force because they took objectively reasonable actions given the totality of the circumstances. An occupant of White's vehicle fired at the Mayor's vehicle, and Officers Harris and Smith used reasonable force moments later to regain control of the situation.

Mayor Bell also is not individually liable under § 1983 either because qualified immunity also applies to him. White and Williams do not contest that Mayor Bell engaged in discretionary duties on November 30, 2012. Further, Mayor Bell did not violate White and Williams' constitutional rights in his supervision of Officers Harris and Smith because he did not participate in, direct, or fail to stop any unconstitutional use of force, and Mayor Bell's supervision did not cause any unconstitutional use of force.

Thus, White and Williams' § 1983 claims against Mayor Bell and Officers Harris and Smith in their individual capacities fail and the court will grant summary judgment in favor of

51

the Defendants on these claims.

Finally, the court notes that while White and Williams' claims fail under existing Eleventh Circuit precedent, the court does not condone the indiscriminate use of force by police officers.

### 4.      State Law Claims

White and Williams also present claims under Alabama law that BPD falsely imprisoned, assaulted, and battered White and Williams. Each claim is discussed below.

### a.      Assault and Battery

White alleges that Officers Harris and Smith assaulted White by chasing White's vehicle and battered White by shooting him. White alleges that Officers Toonson, Camp, and Henderson assaulted and battered White by handcuffing him, placing him under "armed guard" at UAB until December 2, 2012, and keeping his family away from UAB. White alleges that Mayor Bell and the City are vicariously liable for the officers' alleged assaults and batteries. As discussed above in Section VI.C.1.a, White's failure to sue or serve Officers Toonson, Camp, and Henderson means that his attempts to plead direct suits against the officers fail.

Williams alleges that Officers Harris and Smith assaulted Williams by chasing White's vehicle and battered Williams by shooting her. Williams alleges that Fictitious Defendants C, D, E, and F assaulted and battered Williams by handcuffing her, placing her under "armed guard" at UAB until December 2, 2012, and keeping her family away from UAB. Williams alleges that Mayor Bell and the City are vicariously liable for the officers' alleged assaults and batteries. As discussed above in Section VI.C.1.a, Williams' failure to substitute the real parties means that her direct suits against the Fictitious Defendants fail.

Thus, the only viable claims for assault and battery are White and Williams' claims against the City, Mayor Bell, and Officers Harris and Smith. Those claims are discussed below.

### i.      Mayor Bell and Officers Harris and Smith

White and Williams' assault and battery claims against Mayor Bell and Officers Harris and Smith fail because Mayor Bell and Officers Harris and Smith have state-agent immunity.

Under Alabama's state-agent immunity doctrine:

A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . .

(2) exercising his or her judgment in the administration of a department or agency of government [or] . . .

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; . . .

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000); *Ex parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000) (majority of court adopting *Cranman* restatement). The *Cranman* restatement of state-agent immunity includes all circumstances entitling officers to immunity under Ala. Code § 6-5-338(a). *See Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006).

The test for state-agent immunity is analogous to federal qualified immunity. *Brown v. City of Huntsville, Ala*, 608 F.3d 724, 741 (11th Cir. 2010). "If the State agent makes such a

showing [of state-agent immunity], the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006).

Officers Harris and Smith are immune from suit when "exercising judgment in the enforcement of the criminal laws of the State, including . . . arresting or attempting to arrest persons." *Ex parte Cranman*, 792 So. 2d at 405. Similar to the discretionary function analysis above in section VI.C.3.a.i-ii, on November 30, 2012, Officers Harris and Smith acted objectively reasonably to apprehend White, Williams, and Major after an occupant of White's vehicle shot at the Mayor's vehicle. Officers Harris and Smith have state-agent immunity for these actions and White and Williams' assault and battery claims against Officers Harris and Smith fail.

Additionally, Mayor Bell is immune from suit when "exercising his or her judgment in the administration of a department or agency of government." *Ex parte Cranman*, 792 So. 2d at 405. Similar to the discretionary function analysis above in section VI.C.3.a.iii, Mayor Bell acted in his capacity as mayor on November 30, 2012 while returning from official city events.

Further, as discussed above in section VI.C.3.b.i-iii, no evidence exists that Mayor Bell or Officers Harris and Smith violated the Constitution or any law on November 30, 2012. Further, no evidence exists that Mayor Bell or Officers Harris and Smith acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law. Additionally, White and Williams have presented no evidence that Mayor Bell or Officers Harris and Smith knew White or Williams, or had any motive to willfully or maliciously harm them on November 30, 2012.

54

Finally, Officers Toonson, Camp, and Henderson and Fictitious Defendants C, D, E, and F would be entitled to state-agent immunity even if properly joined or named in White and Williams' complaints. To the extent the court can discern what White and Williams contend these individuals did, given their limited descriptions, the court finds that these officers were also involved with the detention of White and Williams and would be entitled to state-agent immunity. *See ex parte Cranman*, 792 So. 2d at 405.

Thus, Mayor Bell and Officers Harris and Smith are entitled to state-agent immunity, and White and Williams assault and battery claims against Mayor Bell and Officers Harris and Smith fail.

### ii.     The City

White and Williams' assault and battery claims against the City also fail because state-agent immunity attaches to government units, such as the City.

"This section [on state-agent immunity] is intended to extend immunity only to peace officers and *governmental units or agencies* authorized to appoint peace officers." Ala. Code § 6-5-338(b) (emphasis added). If a police officer is entitled to state-agent immunity, his employing government entity is also immune. *Brown*, 608 F.3d at 742. Thus, because all the BPD officers are entitled to state-agent immunity, the City is also immune from suit.

White and Williams argue that the City is liable pursuant to Ala. Code § 11-47-190, not for the BPD officers' *intentional torts*, but rather for the allegedly negligent, careless, unskillful acts of the BPD officers. Under Alabama law,

> No city or town shall be liable for damages for injury done to or wrong suffered
> by any person or corporation, unless such injury or wrong was done or suffered
> through the neglect, carelessness, or unskillfulness of some agent, officer, or
> employee of the municipality engaged in work therefor and while acting in the

line of his or her duty . . . .

Ala. Code § 11-47-190. "Section 11-47-190 provides for an action against a municipality for the neglect, carelessness or unskillfulness of its agents, not for their intentional torts." *Franklin v. City of Huntsville*, 670 So. 2d 848, 850 (Ala. 1995) (internal quotation marks omitted). However, negligence does not exist when an officer merely makes the wrong decision.  *See Lee v. Houser*, 148 So. 3d 406, 419 (Ala. 2013). Further, § 11-47-190 does not apply when the plaintiff, in essence, claims vicarious liability for intentional torts. *See Brown v. City of Huntsville,* 608 F.3d 724, 743 (11th Cir. 2010).

For example, in *Brown*, the Eleventh Circuit found that § 11-47-190 did not apply because a police officer's "use of pepper spray and other force against [the plaintiff] was intentional, as opposed to neglectful or careless." *Id.* In *Brown*, a police officer ordered the plaintiff out of her vehicle. *Id.* at 730. The plaintiff could not exit the vehicle because her doors would not open as the vehicle was still in drive. When the plaintiff finally exited the vehicle, the police officer thought the plaintiff attempted to flee and sprayed the plaintiff with pepper spray. *Id.* "The factual issues in this case are not over whether [the police officer's] acts were intentional, but over what [the plaintiff] did  or did not do before [the police officer] acted, the extent of force [the police officer] used, and whether [the plaintiff's actions] justified [the police officer's] use of force in response." *Id.* at 743.

Here, as discussed above, Officers Harris and Smith and the other BPD officers all took intentional actions to regain and maintain control of events on November 30, 2012. No evidence indicates neglectful or careless actions by BPD. Rather, their actions were intentional and the issues in this case are over what White and Williams did before BPD acted, the extent of force

56

used by BPD, and whether White and William's actions justified BPD's use of force.

Thus, state-agent immunity bars White and Williams' state law claims for assault and battery against the City.

### b.      False Imprisonment

White argues that the City is vicariously liable for the actions of Officers Toonson, Camp, and Henderson in falsely imprisoning White by handcuffing him, placing him under "armed guard" at UAB until December 2, 2012, and keeping his family away from him at UAB.

Williams argues that the City is vicariously liable for the actions of Fictitious Defendants C, D, E, and F who handcuffed her, placed her under "armed guard" at UAB until December 2, 2012, and kept her family away from her at UAB. Williams also argues that Fictitious Defendants C, D, E, and F are directly liable for falsely imprisoning her, but, as discussed above in Section VI.C.1.a, Williams' failure to substitute the real parties means that her direct claims against the Fictitious Defendants fail. Thus, White and Williams' only claim for false imprisonment is vicarious liability against the City for the actions of the BPD officers.

The City is not liable for two reasons. First, as discussed above, all BPD officers are entitled to state-agent immunity for falsely imprisoning White and Williams because BPD's use of handcuffs, guards, and security at UAB all related to the apprehension of White and Williams. *See ex parte Cranman*, 792 So. 2d at 405. Further, if a police officer is entitled to state-agent immunity, his employing government entity is also immune. *Brown*, 608 F.3d at 742. Thus, because all the BPD officers are entitled to state-agent immunity, the City is also immune from suit.

Second, "[f]alse imprisonment consists in the unlawful detention of the person of another

for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170. False imprisonment does not occur when an officer detains a party and probable cause exists for the detention. *Walker v. City of Huntsville*, 62 So. 3d 474, 492 (Ala. 2010); *see Upshaw v. McArdle*, 650 So. 2d 875, 878 (Ala. 1994). "Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* (internal quotation marks and citations omitted); *see Brown,* 608 F.3d at 741-42 (Probable cause standard identical to federal qualified immunity standard).

Here, as discussed above in section VI.C.3.b.i-iii, probable cause existed for the apprehension of White and Williams. Officers Harris and Smith observed an occupant of White's vehicle shoot at the Mayor's vehicle and used reasonable force, including detaining White and Williams, to regain control of the situation.

Further, probable cause existed for the continued detention at UAB. Here, BPD had probable cause to restrain White and Williams based on the events observed by Officers Harris and Smith on November 30, 2012. BPD most likely would have taken White and Williams to the Birmingham City Jail or Jefferson County Jail except that White and Williams were injured. The actions BPD took at UAB were reasonable to ensure BPD maintained control of the situation. BPD handcuffed, guarded, and isolated White and Williams for a period of time similar to what would have occurred had White and Williams been sent directly to jail. Thus, no false imprisonment occurred and the City is not liable.

White and Williams argue that the length of time BPD handcuffed and guarded White and Williams renders the City liable. Specifically, White alleges that his detention for more than

eight hours violates a 1984 Consent Decree entered by the Northern District of Alabama in a case between a class of people "who are presently incarcerated or who become incarcerated in the Birmingham City Jail on possible felony charges" and the City of Birmingham. *See McGill v. City of Birmingham*, No. 74-G-0692, slip op. at 2 (N.D. Ala. June 29, 1984); (*See* Doc. 42-32).

The Consent Decree outlines the procedures taken after a person is arrested and includes a requirement that any person arrested by BPD "without a warrant shall be delivered immediately to the Birmingham City Jail" and must be transferred to the Jefferson County Jail within eight hours of arrest. (Doc. 42-32). However, section B of the Consent Decree allows BPD to apply for an extension of an additional forty hours before transfer to the Jefferson County Jail. (Doc. 42, 32). White and Williams' detention by BPD at UAB arguably falls within this procedure because the actions of BPD may have constituted an arrest and White and Williams may be within the class of persons to which the Consent Decree applies.

However, any arguable violation of the Consent Decree is not a basis to find the BPD officers negligent, careless, or unskillful. "A consent decree . . . which arises out of a voluntary settlement and is not based upon a finding of – and is not expressly intended to remedy – violation of the Constitution cannot create or expand constitutional rights," and "a section 1983 claim cannot be based solely on a violation of the order." *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003); *Doe v. Scroggy*, No. 5:04CV173 DF, 2006 WL 3022878, at *8 (M.D. Ga. Oct. 23, 2006) (finding that "although a prison official's strict adherence to all SOPs [standard operating procedures] in every situation is desirable, the imperfect enforcement of a SOP, in the absence of other evidence" is insufficient to violate § 1983).

Further, the Consent Decree is a contract between the parties in the 1984 litigation (which

arguably may include White and Williams if their detention constituted a constructive arrest) and any violation of that contract is properly remedied by petition to the issuing court. *Accord Salter v. Douglas MacArthur State Technical Coll.*, 929 F. Supp. 1470, 1481 (M.D. Ala. 1996) ("However, because Salter was not a party to the consent decree, she does not have standing to seek affirmative relief under the decree, that is, to have the decree enforced according to her interpretation. She only has standing to challenge the legality of the decree itself, to the degree that it affects her."). Petition to the issuing court is proper because, for example, this court does not know whether the parties anticipated an exception for medical emergencies or exigent circumstances beyond the extension procedure in section B of the Consent Decree.

Thus, any violation of the Consent Decree by the officers in handcuffing White and Williams, placing them under "armed guard" at UAB until December 2, 2012, and keeping their families away from UAB is not sufficient to subject the City to vicarious liability in this case.

Thus, White and Williams' false imprisonment claim against the City fails.

**D.      Summary**

The Defendants' motion for summary judgment is **GRANTED**. White and Williams' § 1983 claims against the City fail because they have not shown a policy or custom of the City evidencing deliberate indifference to their constitutional rights. Further, White and Williams' § 1983 claims against Mayor Bell and Officers Harris and Smith in their official or individual capacities fail because Mayor Bell and Officers Harris and Smith cannot be sued in their official capacities and are entitled to qualified immunity in their individual capacities.

Finally, White and Williams' state law claims against the Defendants fail. White and Williams false imprisonment, assault, and battery claims against the City, Mayor Bell and

60

Officers Harris and Smith fail because the Defendants are entitled to state-agent immunity pursuant to *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) and Ala. Code § 6-5-338.

## V.        Conclusion

In conclusion, for the reasons discussed above, the court **GRANTS** the Defendants' motion for summary judgment, (Doc. 34); **GRANTS** in part and **DENIES** in part White and Williams' motion for judicial notice, (Doc. 44); **DENIES** White and Williams' motion to strike, (Doc. 43); and **DENIES** the Defendants' motion to strike, (Doc. 54).

**DONE** and **ORDERED** this 27th day of March, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE